(81 South. 696)

No. 21194.

'CAHN et al. v. BACCICH & DE MONT-
LUZIN.

(April 12, 1915. On the Merits, Dec. 2, 1918.
On Rehearing, May 9, 1919.)

*(Syllabus by the Court.)*

1. APPEAL AND ERROR ☞393 — BOND — DE-
VOLUTIVE AND SUSPENSIVE APPEAL.

Where the appellants obtained an order for
both a devolutive and a suspensive appeal, and
the bond for the devolutive appeal was 'fixed at
$100, and for the suspensive appeal according
to law, and the appellants gave bond and se-
curity for $4,000, *held*, that the bond, though
not good for a suspensive, was amply good for a
devolutive, appeal, and that the obtainment by
appellants of a subsequent order for a devolu-
tive appeal, and the giving of two bonds to per-
fect the same, were mere surplusage.

On the Merits.

*(Additional Syllabus by Editorial Staff.)*

2. CONTRACTS ☞140 — STIFLING BIDDING —
SUBSEQUENT CONTRACT.

Where at judicial sale bidding was stifled
by agreement between one bidder and agent of
another that they should not bid further against
each other, but should match a coin to deter-
mine who should have the property at the price
then bid, the winner to pay the loser a certain
consideration, the principals of such agent, to
whom the property was adjudicated at the sale,
and who thereafter, learning of their agent's
agreement, ratified it, and in pursuance thereof
transferred their adjudication of the auctioned
property to the other bidder, who had won the
coin matching contest, on the latter's agreement
to deliver the promised consideration, were enti-
tled to recover such consideration; such prin-
cipals not having been present or participating
in the illegal combination, but merely ratifying
their agent's agreement.

Monroe, C. J., and Sommerville, J., dissenting.

Appeal from Civil District Court, Parish
of Orleans; T. C. W. Ellis, Judge.

Action by Bertrand I. Cahn and others
against Baccich & De Montluzin. Judgment
for plaintiffs, and defendants appeal. Mo-
tion to dismiss sustained as to the suspen-
sive appeal, but overruled as to the devolu-
tive appeal, and judgment affirmed.

Johnston Armstrong, of New Orleans, for
appellants.

E. Howard McCaleb and Titche & Rogers,
all of New Orleans, for appellees.

LAND, J. [1] Plaintiffs on January 27,
1915, recovered judgment in the court below
against the defendants for the sum of $2,500,
with legal interest thereon from December
7, 1912, and costs.

Defendants moved for and were granted a
devolutive and a suspensive appeal from the
judgment, and the bond for the devolutive
appeal was fixed at $100, and that for a sus-
pensive appeal was fixed according to law.
Defendants furnished bond and security in
the sum of $4,000. Later the defendants ob-
tained another order for a devolutive ap-
peal, and filed two appeal bonds for $100
each.

Motion to Dismiss.

Plaintiffs moved to dismiss the appeal on
the following grounds:

That the bond for $4,000 is inadequate for
a suspensive appeal.

That appellants have abandoned the devolu-
tive appeal which they might have taken un-
der the first motion and order, and have at-
tempted to obtain a second order of appeal,
and the court a quo was without jurisdiction
to grant the second order of appeal.

That the transcript for the second order
of appeal is incomplete.

That there is no bond to which appellees
can look for their surety, as there are two
bonds given for the so-called devolutive ap-
peal, and neither is designated as the bond to
which appellees may look.

The bond for $4,000, though not good for
a suspensive, is good for a devolutive, appeal.
Gilmore v. Meeker, 115 La. 849, 40 South.
244. The appeal having been perfected by
the giving of the first bond, the subsequent
proceedings were superfluous.

It is therefore ordered that the motion to

dismiss be sustained as to the suspensive, but he overruled as to the devolutive, appeal.

### On the Merits.

PROVOSTY, J. Plaintiffs sue to compel the defendants, Baccich & De Montluzin and Edward E. Lafaye, to pay the $2,500 agreed to be paid in the following instrument:

"It is hereby agreed and understood that for the consideration herewith expressed Danziger & Tessier do hereby sell, assign, and set over without warranty to Baccich & De Montluzin a certain adjudication for forty-seven thousand seven hundred and fifty and 00/100 dollars ($47,750.00) of the Lund tract on Gentilly, adjudicated to the said Danziger & Tessier this day by Charles Roth, auctioneer.

"Said Baccich & De Montluzin do hereby agree to deliver to said Danziger & Tessier twenty-five hundred and 00/100 dollars ($2,500.-00) of stock, par value, in a company to be organized, and they further agree to deliver at the same time a guarantee from the said Baccich & De Montluzin that they will purchase said stock, within one year from the date of this agreement, from the said Danziger & Tessier, for the sum of twenty-five hundred and 00/100 dollars ($2,500.00) cash.

"And, further, the said Danziger & Tessier hereby agree to sell to the said Baccich & De Montluzin said twenty-five hundred and 00/100 dollars ($2,500.00) of stock at any time until the expiration of one year from date of this agreement for twenty-five hundred and 00/100 dollars ($2,500.00) cash.

"It is further understood and agreed that all the stock of the new company is to be issued for cash, or on the installment plan for cash, the idea being that there shall be no watered stock, except that it is understood that the Lund tract may be acquired by said company at a valuation not to exceed seventy thousand dollars ($70,000.00).

"It is further understood and agreed that in case the said Baccich & De Montluzin should find the titles not valid to said property, and it shall finally be decided that the said titles are not good, this agreement is to be considered null and void.

"Signed in duplicate this 7th day of December, 1911.     Danziger & Tessier.
               "Baccich & De Montluzin."

Defendants admit that they entered into this agreement, and with the intention of carrying it out faithfully, and they admit

144 LA.—33

that they have the property the adjudication of which was transferred to them in this instrument; but they plead that the agreement evidenced by this instrument was entered into in fraudem legis, and that, therefore, the court will not entertain the suit; in other words, while holding onto the property, they plead their own turpitude and the alleged turpitude of the plaintiffs for not carrying out the contract.

The facts are as follows: The adjudication in question was made at an auction sale of succession property by order of court. The plaintiffs, 12 in number, formed a syndicate for the purchase of the property. They agreed to bid as much as $50,000 on it, and accordingly they deposited $5,000 in bank for meeting the 10 per cent. which would have to be paid in cash on the purchase price; and they agreed that Mr. Tessier, of the real estate firm of Danziger & Tessier, should attend the auction and represent them in bidding for and purchasing the property. This firm was one of the members of the syndicate, and is one of the plaintiffs; or, rather, the liquidator of it is. The auction was attended by a large crowd. Tessier, bidding for his syndicate, stood in front of the crowd, at the auctioneer's stand. De Montluzin, bidding for himself and Lafaye and Baccich (both of whom stood near him), was back of the crowd, some 25 or 30 feet from the auctioneer. Danziger also was present, but none of the other plaintiffs. After all the bidders had dropped out except Tessier and De Montluzin, and these had been bidding against each other for some time, and Tessier had raised the bidding to $47,750, Danziger proposed to De Montluzin that they come to an understanding by which they should stop the competition, and match a coin for determining who should have the property, the winner to give to the loser $2,500 in the stock of a company to be formed for holding the property. De Montluzin agreed to this; and he

and Danziger retired to the rear of the building to do the coin matching, leaving Mr. Baccich to watch the auction. De Montluzin won, and Danziger so recognized. The adjudication, however, was not made to him or to his party, but to Tessier as being the last and highest bidder, and it was Tessier who signed the auctioneer's book and also the following so-called "auctioneer's card":

"New Orleans, La., Dec. 7th, 1911.
"National Realty Co., Ltd.:

"I hereby acknowledge purchasing property located Lund tract offered by auction and adjudicated to me this day for $47,750 dollars, being the last and highest bidder, and will deposit 10 per cent. of purchase price immediately.
"[Signed]        Danziger & Tessier, Agents."

Immediately after the auction the plaintiffs were notified, presumably by Danziger (at any rate not by Tessier, for he had gone to his lunch), of what had taken place, and they met in the office of one of them to consider the matter. At this meeting a vote was taken on the question of whether the agreement made by Danziger should be ratified, and the other parties be allowed to have the property. Three voted against; but the others, including Mr. Bernard Titche, who had been very angry at this agreement having been made, took the view that "it was a promise made" and should be abided by. This decision having been reached, Mr. Titche, who seems to have acted as the attorney in the matter, and Mr. Danziger immediately went to the real estate office of Baccich & De Montluzin, and there executed, with the latter, the document sued on. Thereafter Baccich & De Montluzin made the cash deposit of 10 per cent. of the price of adjudication; and, still later, the auctioneer executed a deed in their favor, reciting that they had been the adjudicatees. One year after the contract sued on had been entered into the plaintiffs, pressing for compliance, received from defendants' then attorney the following letter:

"December 6th, 1912.
"Messrs. Danziger & Tessier, 134 Carondelet St., New Orleans:

"Dear Sirs: Messrs. Baccich & De Montluzin have submitted to me your letter of the 26th ultimo, which accompanied the contract between them and yourselves with reference to the Lund tract. My clients have instructed me to advise you that as soon as they shall have made necessary arrangements to perfect the title to the property they will be able to close the matter with you. In the meantime they desire to crave your indulgence.
"Yours very truly,
"[Signed] F. J. Dreyfous."

The learned trial judge found from the evidence that, when the adjudication was made to Tessier as being the last and highest bidder, he had no knowledge of the agreement which Danziger, without any authority whatever in the premises, had taken upon himself to make with De Montluzin, and that therefore the adjudication was made to Tessier as the agent and representative of the plaintiffs, or, in other words, to the plaintiffs. In his reasons for judgment he said: "Plaintiffs had no knowledge of what had taken place between Danziger and De Montluzin, nor had Mr. Tessier, their agent, when the auction closed, with Tessier, plaintiffs' agent, as the last and highest bidder." And we have reached the same conclusion.

Mr. Tessier testified as follows:

"Q. Well, when that property was adjudicated to you, for whom did you buy it? A. For those people who employed me. Q. The parties whose names are in plaintiffs' petition? A. Yes, sir. Q. I would like to ask you whether there was any modification or equivocation of that bid of any kind? A. None whatever. Q. When you signed that card 'Danziger & Tessier, Agents,' you were the agent—your firm was the agent for whom? A. Signed it as agent for these people —the people who signed as plaintiffs in the case."

To the question whether the agreement between Danziger and De Montluzin was communicated to him before the adjudication had been made, Mr. Tessier answered:

"A. Well, if they did, I don't remember it. I don't think they did. Q. Well, I mean, was there anything said to you, as qualifying your statement, or changing your statement, that, when you bought this property, you bought it for the people you represented? A. Absolutely none. I bought it for those people. I could not have changed it, even if I had a mind to. Q. What? A. I could not have changed it, even if I had had a mind to. Q. Why not? A. They employed me to do it. Q. You mean to say that you would have considered that against your contract of employment? A. Absolutely, unless they released me."

Mr. De Montluzin testified as follows:

"After we agreed upon those terms, Walter Danziger pulled a coin out of his pocket and he said, 'Guess whether the date on this coin is odd or even'—he did this instead of matching—and he stated, before opening his hand, if I guessed right I would win, and if I guessed wrong I would lose, the property. As it was, I guessed right; and he turned to me and he said, 'The property is yours.' At that moment I suggested I should increase the bid by $1, so as to make it a regular bid, and Danziger said that would be entirely unnecessary, as the bid then in could be used as well as ours. With that he and I walked up to Charles Tessier, Sr., and he announced to Charles Tessier the result of our arrangement, and he informed him that the bid then in was for our account. Thereupon the auctioneer knocked the property down, and Charles Tessier signed his book, whether as an individual or as Danziger & Tessier, I don't know; but he was doing it for our account, as he well knew and was so informed."

Mr. Lafaye testified that he was present at the matching of the coin, and that Mr. Danziger, when he found that Mr. De Montluzin had guessed correctly, "advised Mr. De Montluzin that he should get the property. Q. What did Mr. Danziger do after that? A. He and Mr. De Montluzin left, and I advised Mr. Baccich of the result."

There is direct conflict between the testimonies of Tessier and De Montluzin on the point of whether it was prior to or after the adjudication that Tessier was informed of the agreement Danziger had made. On this point Mr. Tessier is corroborated by Mr. Lafaye, who was asked, "What did Mr. Danzig-

er do after that?" (meaning after Mr. Danziger had advised Mr. De Montluzin that he had guessed correctly and had won), and answered, "He and Mr. De Montluzin left, and I advised Mr. Baccich of the result." It will be remembered that when Lafaye, De Montluzin, and Danziger walked to the rear of the building to do the coin matching, Mr. Baccich was left behind to watch the auction. Mr. Tessier is further corroborated by the fact that it was he who signed the auctioneer's book and also the auctioneer's card; thereby, it will be observed, making his firm responsible on this large transaction. He is further corroborated by the very important, in fact, conclusive, circumstance, that he would have been without authority to make any such agreement, and that his instructions were to bid up to $50,000, so that he had yet a margin of $2,500 when the competition ceased. He is further corroborated by the fact that the question of whether the adjudication should be transferred to Baccich & De Montluzin and Lafaye was made a matter of debate and vote by the plaintiffs; three of them voting against, and the others consenting to vote in favor only because a "promise had been made." Finally he is corroborated by the recitals of the contract sued on, the express terms of which Mr. De Montluzin is now seeking to contradict in his testimony. Mr. Tessier was questioned, and he answered as follows: .

"Q. When the last bid was made, did Mr. Danziger go over and say anything to you? A. I think he did come over and talk, but I don't know what he said. I think he came over with Mr. De Montluzin. Q. You think he came over with Mr. De Montluzin? A. I think so. I am not positive. But we all went off together. Q. What did he say? A. I don't know what he said. Q. You don't remember what Mr. Danziger said to you when he came over with Mr. De Montluzin? A. Positively, I do not. Q. You do not remember what Mr. Danziger said to you, as you, Mr. De Montluzin, and he were going out of the Exchange? A. No, sir. Q. You do not remember whether or not he told

you at the time that that property was Baccich & De Montluzin's? A. Why, if he had, Mr. Armstrong, I would not have paid any attention to it. Q. Why did you pay attention to it afterwards? A. Because we had this meeting. Q. Didn't you know before you went to that meeting that your partner had matched a coin to determine who should be the owner of this property for the purpose of stopping the bidding? A. For the purpose of stopping the bidding? Q. Yes? A. Not on my part. Q. Didn't you know that before you went to the meeting? A. That he tossed a coin to stop the bidding? Q. Yes? A. Why, no. He told me that he tossed a coin with De Montluzin after the property was adjudicated to me—in going out of the Exchange—to transfer it to him, and he give me twenty-five hundred dollars ($2,500), or take twenty-five hundred dollars ($2,500), or something of the kind; but I was not a party to that, and don't know anything about it. Q. I do not charge you with being a party to it, in my answer, but I simply say that your partner, Danziger, matched a coin? A. I don't know that he did. I was told that he did. Q. Who told you that? A. They both told me that. Q. They both told you that? A. Yes, sir. Q. As they were on the way out of the Exchange? A. I do not know whether then, or a half hour afterwards, or when, but some time after the adjudication, I was told. Q. When you got out of the Exchange, did Colonel De Montluzin go his way, and you and Mr. Danziger go your way? A. No; I think I went my way first. I don't know where they went. I did not go with Danziger, however. Q. But both Danziger and De Montluzin told you about the matching of this coin? A. I think they did; yes, sir. But I will say this, that that would not bind me, as I felt I was in honor bound by the people who authorized me to buy that property, and I would not have signed a transfer of the adjudication. I would not do it. I could not. At the time it would have made no difference to me who told me; I would not have transferred it without the consent of the parties who employed me, or, rather, with whom I was associated, and had been selected to bid the property in. Q. But the one essential thing that made you stop that bidding— A. That made me stop bidding? A. Let me finish the question. The one essential thing at which you stopped that bidding, when Colonel De Montluzin and Walter Danziger came over to you, you don't remember what Danziger said? A. I did not stop bidding at all. I kept on bidding. It was adjudicated— was finally knocked down—to me. Q. You don't remember what Walter Danziger said? A. I don't remember if he said anything. Mr. Roth knocked the property down to me. I am positive he did not say the property was for Baccich & De Montluzin. Q. Did anybody else? A. Or nobody else, because, if he had, I would have paid no attention to it."

Mr. Tessier seems here to admit that Danziger came to him with De Montluzin before the adjudication was made, but after the coin matching had taken place, and said something to him, and at the same time he says that up to the time of the adjudication these two gentlemen were not within 20 feet of him. This confusion and contradiction, we are satisfied, must have arisen from Mr. Tessier's not having clearly understood the questions.

Danziger, because of certain defalcations on his part (not, however, connected with the present case), had absconded before the trial, and did not testify.

The fact that the auctioneer's deed was made in favor of Baccich & De Montluzin proves nothing, as it was made after the adjudication had been transferred to them by the contract sued on.

[2] The plaintiffs in no wise participated in the turpitude which the defendants are invoking as a defense. The adjudication was made to them; it was theirs, to hold if they chose; but a promise having been made in their name, though unauthorized, and the other parties having been induced thereby to abstain from further bidding, they felt that they were, after a fashion, bound to carry out the agreement. This, however, did not have the effect of making the agreement be the consideration of the transfer of the adjudication. The sole and exclusive consideration of this transfer was the $2,500 of stock which defendants agreed to deliver.

In the course of the trial objections to the testimony were made by defendants at different times; but no bill was reserved. We will add, however, that if bills had been reserved they would have been without merit.

Judgment affirmed.

O'NIELL, J., concurs in the decree, but not in the suggestion that there was turpitude in the agreement between De Montluzin and Danziger.

MONROE, C. J., dissents, and hands down reasons. See 81 South. 700.

SOMMERVILLE, J., dissents, and concurs in the reasons of the CHIEF JUSTICE.

## On Rehearing.

DAWKINS, J. Further consideration of this case has not changed our views. Conceding that as between the original owners of the property and a purchaser who had acquired at a reduced price by stifling of bids the transaction might have been set aside, or that as between those immediately present and participating in the illegal combination, a court would not enforce the agreement to divide the spoils, still we do not think that other persons, not present and in no wise actually participating in the wrongdoing, but who afterwards choose to ratify the agreement and pursuant thereto transfer valuable property rights, can be denied the right to recover the consideration promised for those rights. The law denies relief to those who willfully and knowingly commit a wrong, as a sort of penalty, and because of its unwillingness to assist them in reaping the benefits thereof; but as to third persons who neither authorize nor participate in the wrongdoing but merely take advantage of stipulations in their favor and convey the property to one of those who was a participant in the immoral transaction, the latter cannot, as against his innocent vendors, plead his own turpitude in defense of an action to recover the consideration promised.

According to the record, Danziger will reap none of the benefits of this action.

For the reasons assigned our former decree is reinstated and made the final judgment of this court; defendants to pay costs of this appeal.

MONROE, C. J., dissents.

PROVOSTY, J., concurs for the reasons assigned in the original opinion.

O'NIELL, J., concurs in the decree, on the ground that, as to the parties to the agreement to avoid competition, the agreement was not illegal or harmful, and that, when the agreement was carried out, or was made the basis of another contract, neither party should be allowed to use it to the prejudice of the other.